## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 12-61867-CIV-ROSENBAUM/SELTZER

EDDY NELSON,

      Plaintiff,

vs.

NORTH BROWARD MEDICAL CENTER,

      Defendant.

_____/

## ORDER

      This matter is before the Court upon Defendant's Motion for Summary Judgment [ECF No. 30]. The Court has carefully reviewed the Motions, all supporting and opposing filings, and the record in the case. For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

### *I.  Introduction*

      Plaintiff Eddy Nelson brings claims for employment discrimination against Defendant North Broward Medical Center arising out of Plaintiff's subsequent termination in February 2012 from his employment with Defendant. ECF No. 10. In his Complaint, Plaintiff alleges that he was discriminated against based on his loss of hearing, ECF No. 1, ¶ 8, in violation of the Florida Civil Rights Act of 1992, § 760.10(1)(a), Fla. Stat. (Count I), and the Americans With Disabilities Act of 1990, 42 U.S.C. § 12112(a) (Count II). ECF No. 10. Defendant moves for summary judgment on both counts. ECF No. 30.

1

### *II.  Material Facts*

Defendant North Broward Medical Center ("NBMC") is a nonprofit community health system that offers various healthcare services.  ECF No. 31, ¶ 1.  Beginning in February 1999, Plaintiff Eddy Nelson was employed by NBMC as a "Processing Service Tech."  ECF No. 31, ¶ 8.  Nelson's responsibilities included sterilizing NBMC's surgical instruments for use by NBMC's surgeons and medical staff.  ECF No. 31, ¶ 18; ECF No. 30, ¶ 18.  Nelson was employed for approximately thirteen years before his termination on February 28, 2013.  ECF No. 26-2 at 234:6-:8.

**A. The Incident Leading to Plaintiff Nelson's Termination**

NBMC stated as its reason for Nelson's termination Nelson's purported insubordination and repeated performance issues.  ECF No. 30 at 2; ECF No. 31, ¶ 83; ECF No. 26-2 at 234:9-:12.  The final incident that NBMC asserts culminated in Nelson's firing occurred the day of his termination, at approximately 11:30 a.m.  ECF No. 44-1 at 30:4-:19; ECF No. 44-1 at 31:17-:25; ECF No. 26-2 at 234:6-:12.

That day, Lucretia Hicks, Nelson's immediate supervisor, instructed Nelson to process a medical tray needed for a laparoscopic cholecystectomy, otherwise known as a "lap-chole" tray.  ECF No. 44-1 at 30:4-:19; ECF No. 44-1 at 31:17-:25; ECF No. 26-2 at 234:6-:12;   ECF No. 10, ¶ 10.  Instead of immediately processing the tray, Nelson took his lunch break.  ECF No. 26-4 at 65; ECF No. 26-2 at 249:22-250:12.  Because the tray was required for an upcoming surgery, Hicks then had to clean and prepare the tray herself.  ECF No. 26-4 at 65; ECF No. 44-1 at 33:21; ECF No. 26-2 at 251:18-21.  Nelson admits that his failure to process the tray in accordance with Hicks's instruction did not result from any disability that he may have possessed.  ECF No. 26-3 at 254:14-255:12.

2

NBMC determined this incident to be an indication of Nelson's insubordination and refusal to perform his job.  ECF No. 26-4 at 65.  The parties, however, disagree as to whether Nelson had been trained for processing this type of tray.  Nelson contends that he was never trained to prepare a lap-chole tray and that processing technicians do not perform that function.  ECF No. 26-2 at 250:16-251:7.  He further claims that he asked Hicks for instruction on how to process the tray, but Hicks refused.  ECF No. 26-2 at 250:16-251:7.

For her part, Hicks maintains that Nelson was indeed trained to prepare a lap-chole tray and that she had actually witnessed Nelson clean one in the past.  ECF No. 44-1 at 31:1-:9.  Hicks further denies that Nelson ever requested additional instruction.  ECF No. 44-1 at 31:11-:16.

At the end of his shift on February 28, 2012, Nelson was called to Human Resources.  ECF No. 26-2 at 240:12-241:9.  At the meeting, Kimberly Brown, Nelson's manager and Regional Director of Surgical Services, informed Nelson that he was terminated.  *Id*. at 241:10-:25.  Nelson's termination resulted from a concerted decision among Hicks, Brown, and Grace King, Director of Human Resources.  ECF No. 44-1 at 35:24-36:1.  Other than informing Nelson of his termination, the NBMC employees involved in the meeting discussed no other matters.  *Id*. at 248:21-249:21.  Nor did any NBMC employee make any reference to one of Nelson's disabilities.  ECF No. 31, ¶ 98; ECF No. 40, ¶ 98.

Without contesting the termination or otherwise trying to explain his failure to process the tray, Nelson left the meeting, cleaned out his locker, and departed the premises.  ECF No. 26-2 at 245:12-246:2.  In his deposition, Nelson testified alternatingly that he did not explain his actions because he was experiencing chest pains and had to leave, although he did not report to the emergency room or to a physician, *see* ECF No. 26-2 at 243:2-247:2, and that he firmly believed that

his supervisors would not believe him if he did try to explain his actions, *id*. at 248:15-:20; 252:1-:19.

Nelson protests that his termination did not adhere to the guidelines provided by NBMC's Human Resources Department and claims that NBMC "skipped over" three levels of its own progressive-discipline policy.  ECF No. 39 at 3; ECF No. 40, ¶ 88.  Under NBMC's disciplinary policy, the following corrective actions may be taken as necessary: (1) verbal counseling; (2) written corrective action; (3) final written corrective action including possible suspension; and (4) termination.  ECF No. 41-8 at 1.  But the policy does not mandate that these steps be taken in a set order.  *See id*.  Rather, the policy specifically states that "[t]he procedure will depend on the specific facts pertaining to the situation" and that it "may include" the actions described above.  *Id*.  The policy further acknowledges that "some situations may require that immediate action be taken . . . , steps in the process may be eliminated . . . , [and] [p]revious corrective actions will be considered on a case by case basis."  *Id*.  Hicks, Brown, and King all agreed that Nelson's actions during his shift on February 27 and 28, 2012, were egregious enough to terminate him without first issuing a different corrective action.  ECF No. 44-1 at 36:10-12 (Hicks); ECF No. 41:6-17 (Brown); ECF No. 46-1 at 23:12-24:1 (King).

## B.  Nelson's Prior Disciplinary Issues

While Nelson consistently received modest compensation increases throughout his employment, he was not without his errors.  Nelson's pay increases stemmed from annual performance appraisals.  *See* ECF No. 31.  Although his performance was not poor, nor was it exemplary.  *See* ECF No. 31, ¶¶ 28, 34, 36, 38, 41, 43, 46, 47, 52, 60, 64, 68.  In most reviews, Nelson regularly received criticism such as "does not consistently meet productivity expectations,"

"needs to control his emotions and become more of a 'team oriented' worker," and "does not pay enough attention to quality issues." ECF No. 31, ¶¶ 28, 53; ECF No. 40, ¶¶ 28, 53.

On at least four occasions before Nelson's termination, Nelson's conduct resulted in some form of disciplinary action. First, on March 27, 2008, Nelson received a Written Corrective Action for failing to notify his supervisor that a piece of sterilization equipment was malfunctioning.[1] ECF No. 31, ¶ 57; ECF No. 40, ¶ 57. Second, on September 14, 2009, Nelson was "verbally reprimanded" for failing to properly clean and sterilize a surgical drill. ECF No. 31, ¶ 62; ECF No. 40, ¶ 62. The drill had to be returned twice for having dried blood on the handle even after Nelson's attempted cleanings. *Id*. Third, Nelson received two Employee Coaching Forms on December 27, 2010. ECF No. 31, ¶ 66; ECF No. 40, ¶ 66. The forms documented that Nelson had made several mistakes, including (a) "failing to include a requisite sterile indicator on a bone tray"; (b) "failing to include all of the required medical instruments on a Neuro Lami tray"; and (c) "failing to report missing/incorrect instruments to his coordinator." ECF No. 31, ¶ 66; ECF No. 40, ¶ 66. Nelson admits to having made such mistakes but claims that he made them because of distractions such as answering the phone, running to the operating room, or stopping to answer questions. ECF No. 26-2 at 208:14-:21; ECF No. 31, ¶ 67; ECF No. 40, ¶ 67.

Finally, on February 10, 2012, shortly before his termination, Nelson received a Personnel Action Form/Written Level One Corrective Action for failing to perform several functions of his

---

[1]Nelson admittedly did not notify his immediate supervisor, Hicks, before leaving work. ECF No. 31, ¶ 57; ECF No. 40, ¶ 57; *see also* ECF No. 26-2 at 199:23-200:6. But Nelson claims to have notified a different supervisor. ECF No. 26-2 at 195:25-196:2. In any event, Nelson admits that he failed to document the malfunction in the department communication book, and this failure "directly compromised patient care and safety, as the service technician was not able to repair the sterilization equipment until one [] day later." ECF No. 31, ¶ 57; ECF No. 40, ¶ 57.

position.  ECF No. 26-4 at 62.  The corrective action alleged that Nelson, over the course of two

shifts on February 4 and 5, 2012, had assembled only one tray, while the productivity of his

coworkers had been substantially higher.  ECF No. 26-2 at 219:19-:21, 221:17-:21; ECF No. 31, ¶

76; ECF No. 40, ¶ 76.

According to Nelson, however, his deficient productivity was excusable, as he was the only

person on the day shift and was responsible for the duties of five other individuals.  ECF No. 26-2

at 219:19-220:5.  But even setting these issues aside, the action also admonished Nelson for failing

to ensure that a key part was included on a medical tool, as well as for failing to fill out the daily logs

on a storage tank.  ECF No. 26-4 at 62.  As a result of this incident, NBMC advised Nelson through

a Written Level 1 corrective action that Nelson would continue to be monitored for productivity and

compliance thereafter.  ECF No. 26-2 at 212:18-223:5.

Again, Nelson offers an excuse as to why he did not complete the required logs, claiming that

he would have done so had he been aware that Hicks would not be attending work that day.  ECF

No. 26-2 at 218:2-219:15.   Yet Nelson is unable to confirm whether it was his or Hicks's

responsibility to complete the logs on that particular occasion and even suggests that a different

processing service technician may have been responsible for doing so.[2]  *Id.*

## C.  NBMC's Work Shifts

During Nelson's employment with NBMC, his department used a three-shift workday: (1)

---

[2] At several points throughout Nelson's deposition, he testified in a contradictory or
otherwise unclear manner.  With regard to the logs, Nelson first stated that he could determine
who was responsible for the logs if he had the assignment sheet, suggesting that he could have
been responsible.  Minutes later, however, Nelson represented that preparing the logs was not his
responsibility on the day in question and actually provided the name of the individual who he
said had the responsibility to prepare the daily logs.  ECF No. 26-2 at 224:25-225:18.

a morning shift from 7:00 a.m. to 3:30 p.m; (2) an afternoon shift from 3:00 p.m. to 11:00 p.m; and (3) a night shift from 11:00 p.m. to 7:00 a.m.  ECF No. 31, ¶ 21; ECF No. 40, ¶ 21; ECF No. 26-1 at 62:18-63:16.  When he first began working for NBMC, Nelson was assigned to the second shift, but he was later moved to the first.  ECF No. 26-1 at 63:17-64:5.  Nelson was aware from the outset of his employment that he may be required to cover other shifts and signed documentation acknowledging this obligation.[3]  ECF No. 26-1 at 63:21-64:1; ECF No. 31 ¶ 24; ECF No. 40 ¶ 24. In fact, all positions at NBMC could require working the night shift; employees did not have a completely fixed schedule, and they were informed of this fact upon hiring.  ECF No. 46-1 at 31:9- :13.

### D.  Plaintiff's Disability and Alleged Discrimination

With regard to Nelson's alleged disabilities, the facts as set forth in Nelson's Complaint differ slightly from those asserted in contesting the pending Motion for Summary Judgment.  In his Complaint, Nelson alleges that he was discriminatorily discharged from his employment only because of his hearing-loss disability.  ECF No. 10, ¶¶ 8-13.  In his deposition, however, Nelson testified that he suffered from hearing loss and vertigo.  ECF No. 26-2 at 290:21-291:8.

Similarly, Nelson's allegedly required accommodations differ from the Complaint to his deposition testimony.  In his Complaint, Nelson claimed that he needed to be accommodated at work only by not having to work the night shift.  ECF No. 10, ¶ 11.  According to the Complaint, this was

---

[3]Specifically, Nelson does not dispute that, upon interviewing, he signed an "Interview Sheet" in which he agreed that he "must be able to cover other shifts: 3-11, 11-7 for vacations, sickness, etc.— any time there is a shortage of personnel."  ECF No. 31, ¶ 24; ECF No. 40, ¶ 24. Nelson also signed other documents required by his employment, most of them concerning Defendant's policies, procedures, and guidelines.  *See, e.g.,* ECF No. 31, ¶¶ 7, 8, 14, 24, 30, 39, 48; ECF No. 40, ¶¶ 7, 8, 14, 24, 30, 39, 48.

necessary because of a medication that he was taking for his hearing-loss disability. *Id*.

In his deposition testimony, however, Nelson asserted that his vertigo prevented him from working the night shift.[4]  ECF No. 26-2 at 291:9-:18.  Moreover, in contradiction to his Complaint, Nelson testified that he does not regularly consume any form of medication for any of his conditions. ECF No. 26-1 at 138:25-139:3.  Nelson's sole claim regarding how his vertigo prevents him from completing the night shift is that a doctor recommended performing equilibrium exercises and balancing techniques before bed so as to prevent dizziness from occurring.[5]  ECF No. 26-2 at 139:10-23; 257:11-258:7.

In an incident unrelated to his purported vertigo, hearing loss, or sinusitis, Nelson began suffering back pain, and on June 21, 2011, he was treated by an emergency-room physician.  ECF No. 26-1 at 159:5-20; ECF No. 31, ¶ 69; ECF No. 40, ¶ 69.  After being released from the emergency room, Nelson visited the offices of Reyes & Reyes, M.D., that same day and met with Dr. Dayana Rubio, his general practitioner.  ECF No. 26-1 at 154:16-155:6, 160:20-:24.  In a note that was also dated June 21, 2011 — though not stamped "RECEIVED" by NBMC until more than seven months later, on what appears to be February 1, 2012[6] — Dr. Rubio, who treated Nelson for his back pain,

---

[4] Nelson insisted that the only function that he cannot perform as a result of his claimed disabilities is working the night shift.  ECF No. 26-2 at 292:6-293:4.  In this regard, Nelson averred that his vertigo is most troublesome at night.  *Id*. at 258:2-7.  The only major life activity that he claims that he cannot perform because of his vertigo, hearing loss, and sinusitis includes driving at night, stemming from his vertigo.  *Id*. at 293:5-:14.

[5] The balancing exercises Nelson conducts for the treatment of his vertigo were not given to him by his general practitioner, Dr. Dayana Rubio, but instead by an otolaryngologist who his doctor recommended, Dr. Mark Sukenik.  ECF No. 26-1 at 141:3-8.

[6] The note's date-stamp appears to read "February 1, 2012," but it is unclear whether the day set forth is February 1 or a two-digit day in February beginning with the number "1," as a smudge appears following the "1."  *See* ECF No. 46-1 at 22.  Plaintiff later argues that this

8

provided Nelson with a note that said that Nelson "was recommended to avoid working night shift due to his chronic health condition." ECF No. 46-1 at 22. The note did not identify the "chronic condition" to which Dr. Rubio referred, and, although Dr. Rubio specifically sent Nelson to an otolaryngologist to treat his sinusitis and vertigo, Nelson nonetheless testified that Dr. Rubio's reference to a "chronic condition" in the note referred to Nelson's sinusitis and vertigo. ECF No. 26-1 at 162:16-163:4. In actuality, however, Dr. Rubio does not treat Nelson for either his hearing loss or his vertigo. ECF No. 26-1 at 140:25-142:11. Moreover, the June 24, 2011, NBMC Employee Health Department clearance form authorizing Nelson to return to work after the back-pain incident states, "Okay to return to work. No stated restrictions. Manager notified." *Id.* at 157:5-:21.

Nelson testified that he mentioned the June 21, 2011, note to Daphne DeHaven, Nelson's manager at the time, in June 2011, and she told him not to "worry about it" because she would talk to Hicks about not scheduling Nelson for a night shift. *Id.* at 113:20-114:10; 150:8-:14. Therefore, Nelson did not provide her with a copy of the note. Instead, the first time that Nelson claims to have presented NBMC's Employee Health Department with this note was in January or February 2012, when Nelson returned to work after he had been out related to a sinus infection. *See* ECF No. 26-1 at 143:15-150:22. Nelson further stated that, at that time, Kimberly Brown, the Director of Surgical Services, remarked that "anyone can get a doctor's note." *See id.* at 148:20-149:15.

On February 15, 2012, Nelson was advised by Hicks, via memorandum, that he would be required to work the night shift "as needed." ECF No. 41-3 at 1. When Nelson complained to Hicks that his June 2011 doctor's note indicated he could not comply with her memo, she allegedly

---

smudge indicates tampering with the note and further suggests discriminatory intent.

responded that that was "not fair to the others" and instructed him to talk to Brown.  ECF No. 26-2 at 275:1-5.

In contrast to Nelson's testimony, Brown did not state that Nelson actually produced the note for her, but rather, that she accidentally discovered the note while rearranging employee files.  ECF No. 43-1 at 52:8-:11.  Grace King, Director of Human Resources, became aware of the doctor's note acknowledging Nelson's limitation when Brown later delivered it to the Human Resources Department.  ECF No. 46-1 at 29:16-30:24.  Brown indicated to Nelson that he would be required to obtain a medical accommodation disability form from his physician, but Nelson was terminated prior to obtaining the completed paperwork.  ECF No. 26-2 at 260:10-16, 265:10-17.

Nelson states in his Complaint that Hicks, upon her promotion to supervisor, harassed Nelson about his claimed disability.[7]  ECF No. 10, ¶ 10.   In particular, Nelson testified that on two or three occasions, other employees were unable to contact Nelson while he was at work.  ECF No. 26-1 at 88:22-89:4.  According to Nelson, he was unable to hear the telephone ring due to his hearing loss coupled with the overwhelming sound of the sterilization machinery.  ECF No. 26-1 at 87:15-88:19.  When Hicks discussed the fact that Nelson had not answered the telephone on two or three occasions with him, Nelson found her to be "agitated," although he could describe nothing that she said or did

---

[7] Hicks is the only individual who Nelson claims discriminated against him.  ECF No. 26-2 at 293:25-294:5.  Occasionally, Nelson would have to leave work due to his chronic sinusitis.  ECF No. 26-1 at 144:2-21.  On one occasion in 2011, after returning to work due to a sinusitis episode, Nelson claims that Hicks told him that he was "always getting sick," allegedly expressing her dissatisfaction with his illness.  ECF No. 26-1 at 145:24-148:9.  Nelson, however, does not claim that his hearing loss or vertigo — the two disabilities he asserts he has — caused him to be sick at all.  Nor does Nelson claim that his sinusitis was a qualifying disability under the ADA.  Therefore, the Court does not find this evidence to be bear on the issues pending before the Court.  Because Nelson refers to it in his brief, *see* ECF No. 39 at 18, however, the Court mentions it here and explains why it is not relevant.

to make him feel that way.[8]  ECF No. 26-1 at 90:19-91:11.  Plaintiff Nelson contends that these small incidents, his supervisor's unwillingness to listen to his version of the events regarding prior disciplinary issues, and the timing between being presented with the doctor's note indicating his medical limitation and his ultimate termination yield the conclusion that he was terminated based on his disability, specifically his vertigo.  *See* ECF No. 39 at 2-4.

### III. SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some

---

[8] These discussions regarding Nelson's inability to hear the telephone allegedly occurred two to three times.  ECF No. 26-1 at 90:10-24.  However, Nelson cannot point to the exact date as to when the discussions occurred, stating that they were at some point between 2008 and 2011.  ECF No. 26-1 at 94:7-95:7.  Nelson was never reprimanded for these incidents.  ECF No. 26-1 at 90:19-91:11.

metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

In conducting this analysis, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). But the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

## IV. ANALYSIS

### A.   The ADA Analysis Framework

Nelson alleges that NBMC intentionally discriminated against him on the basis of his handicap, in violation of the Florida Civil Rights Act of 1992, §760.10(1)(a), Fla. Stat. ("FCRA"), Count I, and the Americans With Disabilities Act, 42 U.S.C. 12112(a) ("ADA"), Count II.  More specifically, Nelson claims that he was terminated on February 28, 2012, because of his supervisor's displeasure with his medical conditions and physical impairment.[9]

The ADA provides that an employer shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Similarly, the FCRA safeguards individuals from employer discrimination on the basis of disability.  *See* Fla. Stat. § 760.10(1)(a) (it is "an unlawful employment practice for an employer: [t]o discharge . . . or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, national origin, age, handicap, or marital status").  Under Florida law, the FCRA is construed in conformity with the ADA.  *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1175 (11th Cir. 2005) (citing *Wimberly v. Secs. Tech. Grp., Inc.*, 866 So. 2d 146, 147 (Fla. 4th DCA 2004)).  Therefore, the Court analyzes the claims together.  *See Holly v. Clairson Indus., L.L.C.,* 492

---

[9] Nelson's Complaint alleges only discrimination based on a hearing-loss disability.  ECF No. 10, ¶ 8.  In his deposition testimony and Response to Defendant's Motion for Summary Judgment, though, Nelson avers that he essentially suffers from two disabilities: (a) hearing loss; and (b) vertigo stemming from his hearing loss.  *See* ECF No. 26-2 at 290:21-291:8; ECF No. 39 at 5-8.  Because Nelson suggests that the vertigo arises from his hearing loss, the Court analyzes both alleged disabilities.

F.3d 1247, 1255 (11th Cir. 2007); *Garavito v. City of Tampa*, 640 F. Supp. 2d 1374 (M.D. Fla. 2009).

In 2009, Congress amended the ADA through the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325. Among other purposes, the ADAAA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101. Under the ADA, the definition of "disability" is construed broadly. *See* 29 C.F.R. § 1630.1(c)(4).

To state a claim for employment discrimination under the ADA, a plaintiff must show that (1) he is disabled; (2) he was a "qualified individual" at the relevant time, meaning that "he could perform the essential functions of the job in question with or without reasonable accommodations"; and (3) he was discriminated against because of his disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citing *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000)). Second, courts continue to utilize the *McDonnell Douglas* burden-shifting analysis in ADA cases. *See Beatty v. Hudco Industrial Products, Inc.*, 881 F. Supp. 2d 1344, 1351 (N.D. Ala. 2012).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n. 3 (2003). Once a *prima facie* case is established, the burden of production shifts to the defendant, who must clearly set forth a legitimate, non-discriminatory reason for the employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981) ("The explanation provided must be legally sufficient to justify a judgment for the defendant."). If the defendant meets this burden, it rebuts the presumption raised by the *prima facie* case, and the burden of production then shifts to the plaintiff to show that the reason invoked by the defendant for the employment action was not the true reason for it, but

rather, was a pretext for discrimination.  *Id.*; *see also Wilson*, 376 F.3d at 1087.

"However, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  If a plaintiff puts forth sufficient circumstantial evidence creating an issue of fact as to the employer's discriminatory intent, summary judgment will always be avoided.  *Id.*; *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (finding that the circumstantial evidence necessary to establish a Title VII case of discrimination is "flexible and depends on the particular situation").[10]

The third prong of a *prima facie* case of discrimination under the ADA requires a plaintiff to show that he was discriminated against on the basis of his disability.  42 U.S.C. § 12112(a).  The plaintiff need not prove that discrimination was the sole cause for adverse employment action, as long as it was a determinative factor in the employment decision — that is, the discrimination must have been "a factor that made a difference in the outcome."  *See McNely v. Ocala Star-Banner Corp*, 99 F.3d 1068, 1073-77 (11th Cir. 1996) (rejecting the contention that the employment action need to be "solely because of a reason prohibited by the statute"); *see also  Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999) (relying on *McNely* in holding that a jury instruction directing the jury to consider whether discrimination was *a* motivating factor rather than *the* motivating factor was not erroneous).

--------

[10] The same analysis is used to evaluate discrimination claims brought under Title VII and the FCRA because the FCRA was patterned after Title VII.  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).  Therefore, cases involving Title VII and FCRA claims are instructive in ADA cases.

Here, NBMC asserts that it is entitled to summary judgment because Nelson cannot establish any of the elements of a *prima facie* case of ADA employment discrimination. NBMC also contends that even if Nelson could demonstrate a prima facie case, it has articulated legitimate, non-discriminatory reasons for its adverse employment decision, and Nelson has failed to produce evidence tending to show that NBMC's reasons for terminating Nelson's employment were pretextual.

**B.  Nelson's *Prima Facie* Case**

As noted previously, the disability that Nelson has alleged in this case has been the subject of some change. In his Complaint, Nelson contends that his loss of hearing and a medication he was taking for that problem prevented him from working the night shift. But on the evidentiary record presented with the instant Motion, Nelson claims that he cannot work the night shift because of his vertigo, not his hearing loss. Nevertheless, Nelson continues to assert a claim under the ADA on the basis of his hearing loss. *See* ECF No. 39 at 5.

*1.*  *Does Nelson Have a "Disability" Under the ADA?*

A person has a "disability" within the meaning of the ADA if he "(a) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) [has] a record of such an impairment; or (c) [is] regarded as having such an impairment."[11]  42 U.S.C. § 12102(1)(A).  NBMC disputes that Nelson has a "disability" for the purposes of his ADA claim.  In response, Nelson contends that his hearing loss and vertigo are "physical or mental

---

[11] "Being regarded as having such an impairment" is further defined by the statute as meaning "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

impairment[s] that substantially limit[] one or more major life activities." *See* 42 U.S.C. § 12102(1)(A).

a.      **Nelson's Vertigo**

Under the ADA, whether a person has a "disability" must be considered on an individual basis. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999) (citing 42 U.S.C. § 12102). Thus, courts must make case-by-case determinations of whether a particular plaintiff has a "disability" under the ADA. *See id.*

The ADA defines a "disability" as a "physical or mental impairment that substantially limits one or more major life activities." *See* 42 U.S.C. § 12102(1)(A). An impairment is a disability, in turn, "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id*. § 1630.2(j)(ii). Generally, major life activities include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, . . . concentrating, thinking, communicating, interacting with others, and working." *Id*. § 1630.2(i)(1)(I). "[T]he term 'major' [should] not be interpreted strictly to create a demanding standard for disability." *Id*. § 1630.2(i)(2).

In this case, Nelson testified during his deposition that he experiences vertigo only at night. ECF No. 26-2 at 258:5-:7. He further explained that the vertigo substantially limits or restricts only his ability to work the night shift and his ability to drive at night. *Id*. at 291:9-:18; 293:5-:14. Under the particularized inquiry that the ADA requires courts to undertake, Nelson's vertigo does not qualify as a "disability" because he has not demonstrated that it substantially limits his ability to perform a major life activity.

First, with respect to driving, the Eleventh Circuit has held that driving does not qualify as

17

a major life activity under the ADA.  In this regard, the Eleventh Circuit has reasoned, "It would at the least be an oddity that a major life activity should require a license from the state, revocable for a variety of reasons including failure to ensure." *Chenoweth v. Hillsborough Cnty.*, 250 F.3d 1328, 1329 (11th Cir. 2001).

Second, regarding Nelson's ability to work, as a matter of fact, Nelson has failed to show that his vertigo prevented him from being able to work at night.  Even setting aside the fact that the doctor's note on which he relies to establish his inability to work at night does not mention Nelson's vertigo and was issued more than seven months before Nelson was fired, by a doctor who does not treat him for his vertigo during the course of a visit to that doctor for back pain, the note itself says only that Nelson "was *recommended* to avoid working night shift due to his chronic health condition."  ECF No. 46-1 at 22 (emphasis added).  The note does not indicate that Nelson was medically incapable of working the night shift.  And Nelson himself explained that not working the night shift helps him perform his job functions because Nelson needs to perform equilibrium exercises before bed to prevent dizziness the following day.  ECF No. 26-2 at 257:11-258:4.  Nelson has presented no evidence to show that, because of his vertigo, his body could not readjust to handling the night shift, and he could not successfully do his equilibrium exercises before going to bed under a modified schedule.

But even if Nelson had demonstrated that his vertigo prevented him from being able to work at night, as the Eleventh Circuit has explained, it is not enough that a condition in some way affects the plaintiff's ability to work; rather, the plaintiff must show that his vertigo substantially limits his ability to work.  *D'Angelo v. Con Agra Foods, Inc.*, 422 F.3d 1220, 1226-27 (11th Cir. 2005).  This, in turn, requires a plaintiff to demonstrate "at a minimum, . . . that [he is] unable to work in a broad

class of jobs." *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999)) (quotation marks omitted). The inability to do a single, specific job does not qualify as a "substantial limitation" on the major life activity of working. *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(i)).

In *D'Angelo*, the plaintiff had satisfactorily performed her job with the defendant employer for three years. During that time, she had never felt the need to take medication that had been prescribed for her vertigo symptoms, even though she had occasionally experienced dizziness at work. The court concluded that these facts proved that the plaintiff was not substantially limited in her ability to work.

Nelson's condition burdens his ability to work even less than the that of the plaintiff in *D'Angelo*. Unlike the plaintiff in *D'Angelo*, Nelson has not been prescribed medication for his vertigo, nor has he occasionally experienced dizziness at work.[12] And Nelson performed his job satisfactorily enough to remain employed with NBMC for thirteen years, in comparison to the *D'Angelo* plaintiff's employment of three years. If the *D'Angelo* plaintiff's vertigo did not qualify as a "disability" under the ADA, Nelson's condition similarly can not.

Nor, as Nelson suggests, does *Harb v. Michigan Bell Telephone Co.*, 2007 WL 1565074 (E.D. Mich. May 29, 2007), require a different result. Even setting aside the fact that *Harb* was decided outside this Circuit, in *Harb*, the plaintiff had a history of often suffering vertigo attacks while at work. In response to these attacks, the plaintiff was unable to work, had to take medication,

---

[12]Nelson did testify about a single event where he felt dizzy at work, but that dizziness was accompanied by chest pains that resulted in Nelson's admission to the hospital. While the Court has no doubt that this incident was serious in that it involved chest pain and resulted in Nelson's admission to the hospital, it appears that this incident was not one of simple vertigo, but rather, of an entirely different origin. Moreover, even if it had been solely related to Nelson's vertigo, a single occurrence over thirteen years of employment is not enough to constitute "substantial impairment" of Nelson's ability to work.

and had to wait for the attacks to end before she could do anything else.  On one occasion, the plaintiff had a vertigo attack that lasted for three straight weeks.  Even with these facts, the court explained that it was "doubtful" that the plaintiff's condition rose to the level of a "disability" under the ADA, but it "assume[d], for sake of argument," that it did in conducting the remainder of its analysis.  *Harb*, 2007 WL 1565074 at *5.

Nelson's condition pales by comparison.  Unlike the *Harb* plaintiff, Nelson has not been prescribed medication for his vertigo, nor does he take medication when he experiences vertigo. Nelson has also not suffered any vertigo attacks while at work, let alone having had such attacks "often," like the *Harb* plaintiff.  Finally, Nelson has never described a vertigo attack that lasted anywhere near three weeks long.  Thus, where the court found it "doubtful" that the *Harb* plaintiff's far more severe and frequent vertigo symptoms could qualify as a "disability" under the ADA, Nelson's vertigo does not even meet that level.  Under these circumstances, and particularly in light of the binding precedent established by *D'Angelo*, this Court concludes that Nelson has failed to show that his vertigo qualifies as a "disability" under the ADA, and summary judgment must be granted for NBMC on Nelson's ADA and FCRA claims based on his vertigo.

**b.  Nelson's Hearing Loss**

As noted previously, the ADA defines a "disability" as a "physical or mental impairment that substantially limits one or more major life activities."  *See* 42 U.S.C. § 12102(1)(A).  A physical impairment, in turn, includes "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, [etc.]"  29 C.F.R. § 1630.2(h)(1).  "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  *Id*. §

20

1630.2(j)(ii).  Generally, major life activities include "[c]aring for oneself, performing manual tasks,

seeing, *hearing*, eating, sleeping, walking, standing, sitting, reaching, lifting, . . . concentrating,

thinking, *communicating*, interacting with others, and working."  *Id*. § 1630.2(i)(1)(i) (emphasis

added).

      Unlike Nelson's vertigo, by the terms of the implementing regulations of the ADA, Nelson's

hearing loss qualifies as a "disability," as the regulations specifically list "hearing" and

"communicating" as major life activities.  *Id.*  Therefore, Nelson's diminished capacity to hear and

communicate as a result of his hearing loss qualify as a "physical impairment that substantially limits

one or more major life activities."  *See* 42 U.S.C. § 12102(1)(A); *Downing v. United Parcel Service,

Inc.*, 215 F. Supp. 2d 1303, 1309 (M.D. Fla. 2002) (holding that hearing loss meets the ADA

requirement that the disability must limit one or more major life activities).

2.    <u>Was Nelson a "Qualified Individual" During the Relevant Time?</u>

      Second, Nelson must demonstrate that he was a "qualified individual" during the relevant

period.  In order to be deemed a "qualified individual" for the purposes of an ADA analysis, Nelson

must have been able to "perform the essential functions of the employment position that [he] [held],"

and must have been able to do so with or without reasonable accommodation.  42 U.S.C. § 12111(8);

*see also Davis v. Fla. Power & Light, Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).  Generally, a

function is essential if it is a "fundamental job dut[y] of the employment position."  29 C.F.R. §

1630.2(n)(1).

      Nelson is able to satisfy this element of his prima facie case with regard to his hearing-loss

disability.  While NBMC contests this conclusion, NBMC does not directly contend that Plaintiff's

hearing loss prevents him from performing the essential functions of his employment.  Instead,

NBMC asserts that Nelson's disciplinary and performance evaluations — not his hearing and communication conditions — indicate that he was not qualified to perform the essential functions of his employment.  But, in view of the fact that NBMC hired Nelson in the first place, with his hearing loss, and allowed him to remain employed in his position for thirteen years despite several disciplinary issues over the years demonstrates that Nelson was qualified to perform the essential functions of his job, for purposes of the ADA.  As the Eleventh Circuit has recognized, "where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred."  *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) (citation and quotation marks omitted); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (in Title VII case, finding that, "as evidenced by the fact that [the defendant] hired her in the first place," the plaintiff was qualified for her job, despite the employer's assertion on summary judgment that she was not qualified because of "poor [job] performance").

3.    *Has Nelson Demonstrated that He Was Discriminated Against?*

With regard to his hearing impairment, Nelson has not submitted a scintilla of evidence that his termination was due to discrimination based on his hearing loss.  In fact, Nelson's argument that he was fired because of his disability hinges entirely on the contention that he was terminated because he sought not to work the night shift — a circumstance that Nelson himself admits was not due to his hearing loss.  *See* ECF No. 26-2 at 295:13-:19 (the fact that Hicks "ignored [Nelson's] doctor's note and scheduled [him] for the night shift" is the sole evidence Nelson relies on to show that NBMC made an employment decision based on Nelson's disability); *see also id.* at 297:12-:16; ECF No. 39 at 9 ("the only reason the Plaintiff was terminated was because his vertigo did not allow

him to work the night shift").

The only other evidence introduced to show discrimination on the basis of Nelson's hearing impairment includes Nelson's testimony that, on two or three occasions, Hicks had discussions with him in which she told Nelson that people said that they had tried to call, but no one picked up the telephone. *See* ECF No. 26-1 at 86:25-90:18. Nelson stated that he explained that he must not have heard the telephone because of his hearing impairment. *Id.* According to Nelson, Hicks told Nelson to "listen out for the phone" and seemed "agitated," although she never said or did anything in connection with the alleged "agitation." *Id.* at 90:19-93:10. Nelson cannot identify specifically when these events occurred, although he thinks that they happened sometime between 2008 and 2011. *Id.* at 94:7-95:7.

This is not sufficient evidence to satisfy Nelson's burden to show that Nelson was fired on the basis of his hearing loss. First, Nelson has pointed to no discipline that he suffered as a result of the two or three discussions with Hicks regarding answering the telephone. The mere fact that Hicks spoke to Nelson about answering the telephone does not provide evidence that Hicks discriminated against Nelson because of his hearing loss. And Nelson can identify no objective measure of discrimination. Instead, he relies simply on his own subjective feeling that Hicks was "agitated" during the two or three conversations that she had with Nelson about answering the telephone. A subjective suspicion that Plaintiff was discriminated against because of his hearing disability, without additional corroborative evidence,[13] is insufficient to defeat summary judgment.

---

[13] Nelson also suggests that no other employees were terminated for similar conduct, and that is conclusive evidence of discrimination. But Nelson merely states that a select few other employees did not complete similar tasks, such as failing to document things or releasing uncleaned tools and speculates that they were not disciplined. Even setting aside the fact that Nelson merely speculates as what, if any, discipline such employees received, Nelson does not

*See Howze v. Jefferson County Comm., for Economic Opportunity*, 2012 WL 3775871 at \*11 (N.D. Ala. Aug. 28, 2012).

Second, although this is not a retaliation claim, to the extent that temporal proximity could be used to establish an inference of discrimination, here, Nelson has not made a sufficient showing because he has alleged only two to three incidents occurring anywhere between four years and three months before his termination. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (noting that in the case of retaliation claims a plaintiff may satisfy the causation element by showing a close temporal proximity between the protected conduct and the adverse employment action).[14]

Finally, even Nelson himself does not believe that he was terminated because of his hearing loss; he asserts that he was fired because he claimed not to be able to work the night shift. Nelson's utter lack of corroborative evidence demonstrating either directly or circumstantially that his termination was motivated in part by his hearing loss dooms his *prima facie* case of discrimination

---

identify another employee who engaged in precisely the same conduct that he did, who had his disciplinary record, and was not terminated. The Eleventh Circuit "require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Hawkins v. Potter*, 316 F. App'x 957, 960-61 (11th Cir. 2009) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)). Nelson presents no evidence other than his own speculation that his co-workers had comparable disciplinary records or performance evaluations. This is not enough.

[14] Temporal proximity arises frequently in the context of retaliation claims. These cases have held that "mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). The Eleventh Circuit in *Thomas* further noted that even a mere three-to-four-month disparity was insufficient to show causation. *Id.* Here, Nelson states that these conversations with Hicks occurred at some time between 2008 and 2011. Thus, Nelson fails to establish a causal connection between the discussions at issue and the adverse employment action.

on the basis of his hearing loss, and summary judgment must be granted to NBMC on Nelson's

hearing-loss claims. *See Howze*, 2012 WL 3775871, at *11.

**C. Legitimate Business Reasons for the Employment Action**

While Nelson has failed to establish a *prima facie* case of discrimination under the ADA,

even if he had done so — which, clearly, he has not — summary judgment for NBMC would still

be appropriate.   As noted previously, when a plaintiff establishes a *prima facie* case of

discrimination, the burden then shifts to the defendant to come forward with evidence of a legitimate,

non-discriminatory reason for the challenged employment action. *See Burdine*, 450 U.S. at 255-56

(1981). This burden is "exceedingly light." *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763,

769-70 (11th Cir. 2005).  The employer need only articulate "a clear and reasonably specific non-

discriminatory basis for its actions." *Id.* at 770 (citing *Burdine*, 450 U.S. at 254-55).

NBMC has satisfied this standard here.  As NBMC explains the basis for its actions, it fired

Nelson because of his insubordination and repeated performance problems.  Even viewing the facts

in the light most beneficial to Nelson, Nelson was instructed to perform a task for his supervisor,

Hicks, but instead went to lunch, forcing Hicks to do the task herself.  While Nelson attempts to

excuse his decision to go to lunch by claiming that he did not know how to process the particular

type of tray he was directed to complete, even assuming the truth of this claim, it does not detract

from the fact that Nelson left for lunch without telling anyone that he had not prepared the tray and

before even attempting to complete the task assigned to him.  Nor, upon being told that he was being

fired for insubordination related to his failure to prepare the tray did Nelson even try to explain to

NBMC his claimed basis for not completing the task.  Thus, Nelson never provided NBMC with any

reason why his insubordination was excusable, and NBMC made a reasonable business decision to

end Nelson's employment for Nelson's apparent refusal to do his job.

In short, Nelson had multiple performance issues beginning in March 2008, which ultimately culminated in his termination because of his failure to complete an assigned task. These facts satisfy NBMC's exceedingly light burden to produce a legitimate, nondiscriminatory reason for firing Nelson. *See Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) ("the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons") (internal quotation and citation omitted).

## D.  Evidence of Pretext

Because NBMC met its burden to produce a legitimate, nondiscriminatory reason for terminating Nelson's employment, the burden of production shifts back to Nelson to create a genuine issue of material fact on the question of pretext. *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). To do this, Nelson must "cast sufficient doubt on the defendant's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations omitted). A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Under the latter approach, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overuled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006).

Reviewing the record in a light most favorable to Plaintiff reveals no evidence that would

permit a reasonable factfinder to potentially disbelieve Defendant's proffered explanation for its actions.  As noted previously, Nelson had multiple disciplinary issues.  Nor were any of Nelson's performance issues due to a purported disability, be it hearing loss or vertigo.

While Nelson suggests that NBMC "skipped over" three levels of disciplinary action to fire him, that claim is belied by the record.  NBMC's discipline policy clearly states that the disciplinary procedure "will depend on the specific facts [of the situation]" and acknowledges that some steps may be skipped in certain circumstances.  The incident leading to Nelson's termination was deemed a terminable offense not only by Hicks, the only individual who Nelson claims discriminated against him, but by two other managers, King and Brown.  In this regard, all three managers responsible for Plaintiff's termination agreed that the failure to process the tray in accord with Hick's instruction was a terminable offense on its own.  Moreover, the disciplinary guidelines note that previous corrective actions may be taken into account in determining a solution.  Nelson's record included several prior corrective actions, not to mention Nelson's less-than-stellar performance reviews.  The fact that not every performance issue since March 2008 merited an actual disciplinary referral does not eliminate the fact that Nelson's performance merited some form of reprimand on numerous occasions.

Based on the evidence, NBMC has presented the Court with a legitimate, non-discriminatory reason for the decision to terminate Nelson.  Nelson, however, has failed to present sufficient evidence tending to cast doubt on NBMC's stated reason for firing Nelson.  Therefore, even if Nelson could make a *prima facie* showing, NBMC would still be entitled to summary judgment.

## **V. CONCLUSION**

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** that Defendant's Motion for

Summary Judgment [ECF No. 30] is hereby **GRANTED.**  All pending motions are **DENIED AS**

**MOOT**.  Pursuant to Rule 58(a), Fed. R. Civ. P., the Court will enter Final Judgment by separate

order**.**

       **DONE** and **ORDERED** at Fort Lauderdale, Florida, this 27th day of December 2013.

 

 

_____

ROBIN S. ROSENBAUM

UNITED STATES DISTRICT JUDGE